UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| MOHAMMED "MIKE" ENTEZARI-AFSHAR,<br><br>Petitioner,<br><br>v.<br><br>HAROLD W. CLARKE,<br><br>Respondent. | Case No.  C06-5411RBL<br><br>REPORT AND RECOMMENDATION<br><br>**NOTED FOR:**<br>**March 9, 2007** |

This habeas corpus action has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636 (b)(1)(B) and Local Magistrates' Rules MJR 3 and MJR 4. Petitioner filed this action pursuant to 28 U.S.C. § 2254.

INTRODUCTION AND SUMMARY CONCLUSION

Petitioner challenges his 1990 Clark County conviction for one count of first degree murder (Dkt. # 11, exhibit 1). Petitioner has received leave from the Ninth Circuit to file a second or successive petition and change the caption to reflect Harold Clark as the respondent (Dkt. # 3). The trial court sentenced petitioner to 300 months (Dkt. # 11, exhibit 1).

REPORT AND RECOMMENDATION
Page - 1

The state courts have found petitioner's 2003 collateral challenge to be procedurally barred (Dkt. # 11, exhibits 17, 19, and 21). Having reviewed the petition the court concludes petitioner does not meet the legal requirements for presenting an actual innocence claim. This petition is procedurally barred. The petition should be **DISMISSED WITH PREJUDICE.**

<u>FACTS</u>

The Washington Court of Appeals summarized the facts surrounding Entezari-Afshar's conviction as follows:

> Mike and Effie Entezari were married in 1967. They had two children, a daughter, who is now a college student at Washington State University, and a son, a high school student. In February of 1988, Effie Entezari moved out of the family home and filed an action for dissolution of their marriage.
>
> As part of the dissolution action, Effie and Mike Entezari were involved in a contested hearing to determine which of them was entitled to collect rent on one of their rental properties. The property, which was rented to Kenneth and Teresa Ward, was located across the street from the Entezari's residence, then being occupied by Mike Entezari and his son. The trial judge hearing that matter entered a temporary order authorizing Effie Entezari to receive the rent money.
>
> On August 12, 1988, Effie Entezari delivered the court's order to the Wards and explained to them that they should pay the rent to her instead of Mike Entezari. After Effie Entezari left the Wards' residence, Mike Entezari came across the street to find out why she had been there. Entezari told the Wards at that time that in Iran, his native country, "if a woman is married to a man and brings wealth with her to that marriage, and then leaves that marriage, … she is not entitled to take any of the money or the wealth that she brought to that marriage." He also told the Wards that in Iran, "the man can, if he so desires it, have her executed or can do it himself."
>
> The Entezaris were unable to reach a property settlement and, as a consequence, their dissolution trial was set for May 9, 1989. They were scheduled to give depositions on May 2, 1989, but the day before the depositions were to be taken, Effie was shot in the head and killed. The shooting took place in a parking lot adjacent to the apartment building in which she lived. Several residents of the apartment complex heard what they variously described as a "backfire," "firecracker," or "gunshot" that morning. One resident, Brenda Chapman, arrived at the apartment complex after working a "night shift" and found Effie Entezari's body lying on the ground near a car. Chapman called the police. When they arrived they found Effie Entezari's car keys, purse and wallet next to her body. The wallet still contained $250.
>
> Detectives Spooner and Buckner of the Clark County Sheriff's Department contacted the Entezaris' son at his school to advise him of his mother's death. Before he was told that his mother had been killed, he told Spooner that he had awakened at about 6 a.m. and discovered that his father and his father's Honda automobile were both gone from the residence. The son also told Spooner that it was very "odd" for his father to be gone at the time because he ordinarily did not leave the house before noon.

REPORT AND RECOMMENDATION
Page - 2

After the son was told that his mother had been killed, he advised Spooner that he believed his father was at Providence Hospital in Portland that afternoon for some tests. Spooner called Providence Hospital and confirmed that Mike Entezari was there. Spooner and Buckner then went to Portland and contacted Entezari at the hospital. They were later joined there by Detectives Trimble and Nelson.

Trimble advised Entezari of his <u>Miranda</u> rights. Entezari then consented to a search of his Honda automobile. Trimble made a cursory search of the interior of the car including the glove box and hatchback area. He found nothing of significance. Trimble then drove ahead of Entezari to the office of Entezari's attorney in Vancouver. Entezari was in his attorney's office for several hours. With the exception of one hour, the police kept Entezari's car under surveillance during the time he was in the attorney's office. After Entezari left the attorney's office, Trimble confronted him and advised him that he was in the process of obtaining a warrant to search Entezari's house. Entezari then proceeded to his home in his Honda. Detectives Spooner and Buckner arrived at Entezari's residence at about the same time as Entezari did. Spooner escorted Entezari inside the home to await the search warrant.

Shortly thereafter, Detective Nelson telephoned a Clark County District Court judge in order to obtain a search warrant. He read an affidavit to the judge which stated, in part, as follows:

> Based on the aforementioned facts, your affiant prays the court for the issuance of a Search Warrant for the aforedescribed residence, including outbuildings, curtilage thereto and the person of Mohamed Entezari.

Upon completion of the reading of the affidavit, the district court judge stated, "Okay. I find there is probable cause to go ahead and do the search." Nelson then read the text of the search warrant to the District Court judge, as follows:

> You are therefore commanded that with the necessary and proper assistance to make a diligent search, good cause having been shown therefore, of the following described property -- , within 72 hours of the issuance of this warrant: a dark blue and light blue single story ranch style, wood frame home, which is, has a composition style roof, bearing the specific address of 8720 NE Benton Drive, Vancouver, Clark County, State of Washington.

Trimble and Nelson executed the warrant. Nelson seized the clothing Entezari was wearing. Trimble seized a box in the garage that contained a pistol box, a sales slip, a pair of pistol grips, and a brochure for a shooting range. Near these items, Trimble found and seized another box which contained a 50-cartridge box of .38 caliber ammunition. Six rounds were missing from that box.

Detective Spooner again searched the Honda automobile, which was parked in the driveway of the residence. Under a floor mat in the back seat, he found and seized an unloaded .38 caliber, 5-shot revolver. Next to the revolver Nelson found four live rounds of ammunition which matched the ammunition in the box. He also seized a fifth round, a "hollow point."

Mike Entezari was ultimately charged in Clark County Superior Court with first degree murder. Before trial, Entezari moved to suppress all of the evidence that had been seized by Nelson and Trimble on grounds that the affidavit (1) failed to

establish probable cause, and (2) contained misrepresentations and omissions. He also moved to suppress the items seized from the Honda for the reasons that (1) the affidavit failed to establish probable cause to search the Honda, (2) the Honda was outside the scope of the search authorized by the warrant, and (3) the search was a repetitive, unconstitutional search. After a hearing, the motions to suppress were denied. The evidence seized pursuant to the warrant was introduced at trial. A jury found Entezari guilty of first degree murder.

(Dkt. # 11, exhibit 3, pages 2 to 6).

## PROCEDURAL HISTORY

Petitioner through counsel filed a direct appeal. The Washington State Court of Appeals affirmed the conviction and sentence (Dkt. # 11, exhibit 3). Petitioner moved for discretionary review and raised the following issues:

(1) Does it violate the Fourth Amendment and Article 1, Section 7, to interpret a search warrant which expressly authorizes the search of "a dark blue, and light blue single story ranch style, wood frame home, which has a composition style roof," as impliedly authorizing police to search the interior of a locked automobile, parked outdoors n a driveway, in an area which is part of the curtilage?

(2) Did the Court of Appeals violate the petitioner's rights under the Equal Protection Clause by refusing to apply the law of State v. Kelley, 52 Wn. App. 581 (1988), to the petitioner?

(3) In order to meet state and federal constitutional standards, must such a warrant which allegedly impliedly authorizes the search of a locked vehicle parked outside a house, be supported by a showing of probable cause to believe that the car – in addition to the house – contains evidence of a crime?

(4) Is a second police search of the same car, carried out within hours of the first search, a violation of the Fourth Amendment and Article I, Section 7, where the police have had the car under continuous surveillance from the time of the first search to the time of the second search?

(5) Is it an intentional material misrepresentation, which vitiates the warrant, to obtain a search warrant which (according to the Court below impliedly) authorizes the search of a car, without telling the magistrate that the police just searched the car a few hours ago, found nothing, and have had the car under surveillance ever since?

(6) Did it violate the defendant's due process right to a fair trial to admit testimony that several months prior to his wife's murder, the defendant allegedly told neighbors that in Iran a man could have his wife killed if she tried to divorce him?

(Dkt. #11, exhibit 7). The Washington State Supreme Court denied review on June 10, 1993 (Dkt. # 11, exhibit 8). Petitioner filed a motion for certiorari which was denied November 1, 1993. Entezari-Afshar v. Wright, 510 U.S. 947 (1993).

REPORT AND RECOMMENDATION
Page - 4

Petitioner filed his first Federal Habeas Corpus petition in 1997. The court denied the petition and that denial was upheld by the Ninth Circuit. See, Entezari-Afshar v. Wright, CV-97-5239FDB. Petition filed for a writ of certiorari which was denied in 1999. Entezari-Afshar v. Wright, 526 U.S. 1145 (1999).

Four years later, in October of 2003, petitioner filed a Personal Restraint Petition in state court claiming newly discovered evidence (Dkt. # 11, exhibit 11). After amendment, the petition contained only one ground for relief. Petitioner contended "[n]ewly-discovered evidence makes petitioner's continued restraint a violation of the Due Process Clause of the Fourteenth Amendment" (Dkt. # 11, exhibit 14). The Washington State Court of Appeals examined the case and determined the evidence presented by petitioner did not satisfy the newly-discovered evidence standard (Dkt. # 11, exhibit 17). The petitioner was time barred, and because the standard for a newly discovered evidence case had not been met he did not fit within an exception to the time bar.

Petitioner sought discretionary review in the Washington State Supreme Court and raised the following grounds for relief:

1. Whether the Court of Appeals erred in not reaching the merits of petitioner's state court newly discovered evidence claim?

2. Whether the Court of Appeals violated the Due Process Clause of the Fifth and Fourteenth Amendments in not reaching the merits of petitioner's state court new discovered evidence claim?

3. Whether RAP 16(c)(3), to the extent it prohibits reaching the merits of the newly discovered evidence claim of an actually innocent petitioner, violates the Due Process Clauses of the Fifth and Fourteenth Amendments?

4. Whether trial counsel was ineffective in failing to present evidence of actual innocence that the Court of Appeals asserts was readily available at trial?

(Dkt. # 11, exhibit 18).

The Washington State Supreme Court Commissioner denied review. In making its ruling the Washington State Supreme Court conducted a de novo review stated:

> To qualify as newly discovered, evidence must have been discovered since trial, must be material, must be such that it would probably change the result, and must not be merely cumulative or impeaching. *In re Stenson*, 150 Wn.2d 207, 217, 76 P.3d 241 (2003). One of the issues at trial was whether Mr. Entezari's gun could have been the murder weapon. Mr. Entezari argued that, because there were no high-velocity blood spatters on his gun, it could not have been the gun that was used to shoot Mrs. Entezari at close range. Mr. Entezari now presents evidence indicating

REPORT AND RECOMMENDATION
Page - 5

that there were high velocity blood splatters on Mrs. Entezari's sweater and purse and that the blood was hers. He reasons that this shows that the firing of the gun caused blood splatters, and that their absence from Mr. Entezari's gun undermines the State's case. But Mr. Entezari does not show these spatters were undiscoverable prior to trial, and though new DNA testing methods may now show that the blood belonged to Mrs. Entezari, that inference could have been made at trial without DNA evidence.

Mr. Entezari also presents evidence that particles found on his jeans were not human blood (a prosecution expert testified that one of the particles he examined was human blood). But Mr. Entezari does not show this evidence was undiscoverable before trial.

Finally, Mr. Entezari contends that new expert evidence undermines the State's expert testimony that the match in elemental composition between bullet fragments recovered at the scene and bullets seized from Mr. Entezari would not likely be found in a random comparison. But again Mr. Extezari does not show that such evidence was undiscoverable at the time of trial, nor does he show that this new evidence is other than merely impeaching or that it would likely change the result of the trial.

Mr. Entezari also argues that, to the extent the newly discovered evidence rules prevent actually innocent petitioners from challenging their convictions on the merits, they are unconstitutional. But Mr. Entezari's "new" evidence does not establish his actual innocence. Contrary to Mr. Entezari's assertion, it is not now "essentially undisputed" that his gun was not the murder weapon. And even if the gun found in Mr.. Entezari's car was not the murder weapon, that does not prove his innocence.

Finally, Mr. Entezari contends that, to the extent trial counsel did not discover the evidence now presented, he was constitutionally ineffective. But Mr. Entezari did not raise an ineffective assistance claim in his personal restraint petition. He may not raise the issue for the first time in a motion for discretionary review. *In re Lord*, 152 Wn.2d 182, 188 94 P.3d 952 (2004).

(Dkt. # 11, exhibit 19). Petitioner moved to modify the Commissioner's ruling and that motion was denied November 14, 2005.(Dkt. # 11, exhibit 22). This second federal petition followed and petitioner raises the following grounds for review:

1. Washington State's procedure for dealing with postconviction challenges violates the First, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

2. Mr. Entezari is actually innocent of murder. His continued incarceration violates due process of law under U.S. Const. Amends. 5 and 14, which entitles him to relief.

3. Mr. Entezari received ineffective assistance of counsel at trial.

(Dkt. # 1, pages 5 to 8).

### EVIDENTIARY HEARING

If a habeas applicant has failed to develop the factual basis for a claim in state court, an

REPORT AND RECOMMENDATION
Page - 6

evidentiary hearing may not be held unless (A) the claim relies on (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable, or there is (2) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. §2254(e)(2) (1996). Petitioner's claims rely on established rules of constitutional law. Further, petitioner has not set forth a factual basis for his claims that could not have been previously discovered by due diligence. Finally, the facts underlying petitioner's claims are insufficient to establish that no rational fact finder would have found him guilty of the crime. Therefore, petitioner is not entitled to an evidentiary hearing.

## STANDARD

Federal courts may intervene in the state judicial process only to correct wrongs of a constitutional dimension. Engle v. Isaac, 456 U.S. 107 (1983). Section 2254 is explicit in that a federal court may entertain an application for writ of habeas corpus "only on the ground that [the petitioner] is in custody in violation of the constitution or law or treaties of the United States." 28 U.S.C. § 2254(a)(1995). The Supreme Court has stated many times that federal habeas corpus relief does not lie for errors of state law. Lewis v. Jeffers, 497 U.S. 764 (1990); Pulley v. Harris, 465 U.S.37, 41 (1984); Estelle v. McGuire, 502 U.S. 62 (1991).

Further, a habeas corpus petition shall not be granted with respect to any claim adjudicated on the merits in the state courts unless the adjudication either (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to the state courts. 28 U.S.C. §2254(d). A determination of a factual issue by a state court shall be presumed correct, and the applicant has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. §2254(e)(1).

## DISCUSSION

REPORT AND RECOMMENDATION
Page - 7

A.   Exhaustion.

In order to satisfy the exhaustion requirement, petitioner's claims must have been fairly presented to the state's highest court. Picard v. Connor, 404 U.S. 270, 276 (1971); Middleton v. Cupp, 768 F.2d 1083, 1086 (9th Cir. 1985). A federal habeas petitioner must provide the state courts with a fair opportunity to correct alleged violations of prisoners' federal rights. Duncan v. Henry, 513 U.S. 364 (1995). It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state law claim was made. Id, *citing* Picard v. Connor, 404 U.S. 270 (1971) and Anderson v. Harless, 459 U.S. 4 (1982).

The ineffective assistance of counsel claim, and claim relating to the constitutionality of Washington's post conviction relief rules were never presented to the Washington State Court of Appeals. These issues were first raised in his final petition for discretionary review (Dkt. # 11, exhibit 19). These issues are not properly exhausted. The court notes that the Washington Supreme Court Commissioner did address petitioner's constitutionality of the rules claim. The commissioner found petitioner did not present proper evidence of actual innocence. (Dkt. # 11, exhibit 19).

B.   Procedural Bar.

The state courts specifically found the last round of Personal Restraint Petitions procedurally barred (Dkt. # 11, exhibits 17 and 19). Normally, a federal court faced with an unexhausted or mixed petition dismisses the petition without prejudice, so that the petitioner has an opportunity to exhaust the claims in state court. Here, however, petitioner is barred from filing another petition in state court as any attempt to file another petition will be deemed successive and time barred. See, RCW10.73.090 and RCW 10.73.140.

Federal Courts generally honor state procedural bars unless it would result in a "fundamental miscarriage of justice" or, petitioner demonstrates cause and prejudice. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Here, petitioner attempts to proceed despite the procedural bar through the "actual innocence gateway." That issue must be considered.

C.   Actual Innocence.

The standard for an actual innocence claim is set forth in respondent's memorandum in

REPORT AND RECOMMENDATION
Page - 8

support of his petition. As petitioner notes:

> Under AEDPA, a claim of "actual innocence" is sufficient to overcome otherwise procedurally barred claims for federal Habeas relief:
>
>> In order to present otherwise procedurally barred claims to a federal habeas court, a petitioner must come forward with sufficient proof of his actual innocence to bring him "within 'the narrow class of cases...implicating a fundamental miscarriage of justice.'" Id. [Schlup v. Delo, 513 U.S. 298, 130 L. Ed. 2d 808, 115 S. Ct. 851 (1995)] at 314-15 (quoting McCleskey v. Zant, 499 U.S. 467, 494, 113 L. Ed 2d 517, 111 S. Ct. 1454 (1991)). Actual innocence can be shown when a petitioner 'presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of non harmless constitutional error." Schlup, 513 U.S. at 316. In contrast to the standard for 'actual innocence" applicable to claims of substantive v constitutional error, see Herrera v. Collins, 506 U.S. 390, 122 L. Ed. 2d 203, 113 S. Ct. 853 (1993), a petitioner's claim of actual innocence [under Schlup is ....'not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits.'" Schlup, 513 U.S. at 315 (quoting Herrera, 506 U.S. at 404).

(Dkt. # 2, pages 13 and 14). The Supreme Court has given guidance to courts facing an actual innocence claim:

> The meaning of actual innocence as formulated by *Sawyer*, and *Carrier* does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty. It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.
>
> We note finally that the *Carrier* standard requires a petitioner to show that it is more likely than not that "no reasonable juror" would have convicted him. The word "reasonable" in that formulation is not without meaning. It must be presumed that a reasonable juror would consider fairly all of the evidence presented. It must also be presumed that such a juror would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt.

Schlup, 513 U.S. 298, 329 (1995).

The court ordered the trial transcript in this case so the court could properly apply the holding in Schlup and consider all the evidence (Dkt. # 14). The court examined the evidence submitted, but did not consider the testimony of Edward Suzuki. Mr. Suzuki's testimony is the main contested issue in the petition and his testimony raised the bullet composition issue.

REPORT AND RECOMMENDATION
Page - 9

Prior to 2002, forensic scientists attempted to match bullets from crime scenes to other ammunition. The forensic scientists were attempting to provide evidence that a bullet came from a certain box of ammunition or lot of ammunition. The theories underlying this field have been called into doubt and are no longer widely accepted in the scientific community.

The case against Mr. Entezari rested on circumstantial evidence. Without Mr. Suzuki's testimony there is still overwhelming circumstantial evidence to support the juries finding of guilt. Some of this evidence is set forth in the facts section of this Report and Recommendation and need not be reiterated.

The prosecution presented several witnesses who placed the time of the gun shot at approximately 6:00 A.M.. (Dkt. # 17). This testimony was the subject of a considerable number of the witnesses.

The state introduced the testimony of Glen Leroy Perry. Mr. Perry testified he had seen one of Mr. Entezari's cars, a red Toyota Supra, at the apartment complex where Mrs. Entezari lived a number of times in the weeks prior to the murder (Dkt. # 17, page 113 and 114). He testified he would see the car in a cul-de-sac between 5:00 and 6:00 A.M.. He testified he was positive it was the same car and the last time he had seen it was two days before the murder. On the day of the murder Mr. Extezari drove his red Honda and not the Toyota Supra.

On the day of the murder Mr. Entezari left home before 6:00 A.M.. His leaving home that early was rare according to his son. Mr. Entezari's son, Pooya, was interviewed by Officer Spooner who testified regarding the interview (Dkt. # 17, page 408). Mr. Entezari leaving the house that early was described by his son as "odd." Id. Officer Spooner received a substantial amount of information from Pooya prior to Pooya learning his mother had been killed. Pooya's actual testimony at trial was impeached with several of the prior inconsistent statements (Dkt. # 17 pages 341 to 378).

The state offered the testimony of two ballistic specialists who both testified, without reservation, the bullet that killed Mrs. Entezari came from Mr. Entezari's pistol (Dkt. # 17, pages 607 to 732, testimony of Larry Herbert, pages 974 to 1063, testimony of Frank Lee). They testified the bullet recovered at the scene was a .38 caliber bullet and it had eight lands and eight groves

etched into it from its passage down the barrel of the pistol that fired it. Mr. Entezari's pistol had this eight land and eight groves pattern and that characteristic is a "class characteristic." While this evidence does not prove Mr. Entezaris Chater Arms pistol was the murder weapon, weapons with other characteristics, such as a five land and grove pattern, are eliminated as potential murder weapons.

Both Mr. Herbert and Mr. Lee were able to match test bullets fired from Mr. Entezari's weapon to the bullet recovered at the crime scene. This testimony was contested by other expert witnesses presented by the defense. The difference of opinions centers around how much of a bullet needs to be intact to make a match and how may consecutive strata lines must match. The bullet recovered at the scene was 3/8 of a total bullet and was altered from its original condition by its impact with bone (Dkt. # 17, pages 974 to 1063).

With regard to motive, as part of the divorce, Mrs. Entezari was receiving rent payments on a property. Those rent payments had previously gone to Mr. Entezari. There was also a law suit between the Enezari's and Mr. Entezari's brother. The brother had lent a considerable amount of money to the family. Thus, there was financial motive as well as the divorce itself.

Petitioner presents evidence regarding high velocity blood splatter on the victim's sweater and hand bag. DNA testing now shows the blood was in fact the victims, but there was never any question the blood on her belonged to anyone else.

Petitioner argues the lack of high velocity blood splatter on the murder weapon is evidence of actual innocence. This is not new evidence and there was testimony regarding the lack of blood on the murder weapon at trial. The evidence of high velocity blood splatter on Mrs. Entezari is not evidence of actual innocence. Further, the lack of blood on the murder weapon and lack of high velocity blood splatter on the murder weapon was specifically addressed at trial (Dkt. # 17, pages 163 to 181, Dr. Lewman, pages 641 and 642, testimony of Larry Herbert). Larry Herbert testified many factors such as the victims hair, wind direction, and the gases escaping from the muzzle of the pistol may shield the gun from high velocity splatter. Thus, the lack of blood on the murder weapon, including the lack of high velocity splatter, was before the jury.

The prosecution presented evidence to prove every element of the crime even without the

REPORT AND RECOMMENDATION
Page - 11

testimony of Edward Suzuki. The court does not agree that no reasonable juror would have found the defendant guilty.   Plaintiff's attempt to proceed with procedurally barred claims through the actual innocence gateway fails.

Accordingly the states dismissal of the procedurally barred claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court. The state court decisions did not result in a decision that is based on an unreasonable determination of the facts in light of the evidence presented to the state courts. This petition should be **DISMISSED WITH PREJUDICE.**

## CONCLUSION

This petition does not meet the actual innocence exception and the claims are procedurally barred. The petition should be **DISMISSED WITH PREJUDICE**.  A proposed order accompanies this report and recommendation.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on **October 22nd, 2006**, as noted in the caption.

Dated this 9 day of February, 2007

.

/S/ *J. Kelley Arnold*
J. Kelley Arnold
United States Magistrate Judge